# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2221

_____

United States of America

*Plaintiff - Appellee*

v.

Scott Michael Harry

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: May 16, 2019
Filed: July 22, 2019

_____

Before SMITH, Chief Judge, WOLLMAN and KOBES, Circuit Judges.

_____

SMITH, Chief Judge.

Scott Michael Harry challenges his conviction for possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 851. Harry argues the district court[1] erred in denying his motion to suppress evidence

---

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

gathered incident to a police search of a truck Harry was driving; admitting evidence of certain prior bad acts against him; and declining to admit similar prior bad acts evidence against Dennis Thul, the truck's passenger. We disagree and affirm the judgment of the district court.[2]

I. *Background*

On the morning of February 10, 2017, Investigator Adam Williams of the Dubuque Drug Task Force received a text message from a confidential informant (CI). The CI informed him that Harry had left Dubuque, Iowa, around 4 a.m. to "pick up." The CI believed Harry would be driving about four hours both to and from the "pick up" and that he believed Harry would return to Dubuque around noon. *United States v. Harry*, No. 2:17-cr-01017-LTS, 2017 WL 5458002, at *1, (N.D. Iowa, Nov. 14, 2017). The CI further stated that Harry would be riding with Dennis Thul in a newer, single-cab, white pickup truck registered to Thul's father, Dale. At 12:24 p.m., the CI sent a text message to Williams informing him that Harry was about one hour away from Dubuque.

Officers interpreted "pick up" as meaning "pick up drugs." They researched Dale's vehicle registrations and identified a truck matching the CI's description. They then set up surveillance on the roads leading into Dubuque. While on surveillance, Investigator Williams identified a truck matching the CI's description and called Deputy Daniel Kearney, a K-9 officer also patrolling the highway, to inform him of the sighting.

Shortly thereafter, Deputy Kearney observed the truck traveling at 75 mph in a 65 mph zone. He initiated a stop at 12:50 p.m. Harry was driving with Thul as a passenger. Deputy Kearney recognized Harry and Thul from previous encounters.

---

[2]Harry has also submitted a pro se motion for leave to file supplemental briefing. We deny his motion.

Investigator Williams arrived at the scene within moments and approached the vehicle at 12:51 p.m. Investigator Williams and Deputy Kearney then collaborated to process the traffic violation while also searching the truck for drugs. At 12:52 p.m., Deputy Kearney requested that Investigator Williams run Harry's name and address, as Harry presented no driver's license. Less than a minute later, Deputy Kearney deployed a drug-sniffing dog on the truck. Within seconds,[3] the dog detected drugs. At 12:58 p.m., Deputy Kearney advised Harry that he would be issuing him a speeding warning. Then, at 1:03 p.m., Investigator Williams uncovered about a pound and a half of methamphetamine stashed inside a pipe in the truck's bed.

Investigator Williams advised Harry of his *Miranda* rights. Harry initially denied knowledge of the drugs but subsequently claimed ownership of them, explaining that he had been paid $5,000 to transport the drugs and that Thul was just riding along. Officers also viewed messages between Thul and Harry supporting Harry's claim that the drugs belonged to Harry and not Thul.

Prior to trial, Harry moved to have the search evidence suppressed. Harry initially claimed the officers had not had reasonable suspicion or probable cause to stop the truck. He later amended his suppression motion to argue that the dog sniff had improperly extended the stop. The magistrate judge disagreed, and the district court adopted the magistrate judge's conclusions, finding that the CI's tip had generated

---

[3]According to the timeline adopted by the district court, 23 seconds (12:52:54–12:53:17 p.m.) elapsed between Deputy Kearney's deployment of the dog and the dog's alert.

reasonable suspicion for a search.[4] However, the district court additionally found that the dog sniff had not extended the stop.[5]

Though Harry had admitted ownership of the drugs, he subsequently changed his position. He later claimed the drugs actually belonged to Thul. He contended that Thul had promised him a user amount of methamphetamine in exchange for riding along with him. Consistent with his new position, prior to trial, Harry sought permission to introduce certain bad acts evidence against Thul. He also moved to prevent the government from introducing evidence under Federal Rule of Evidence 404(b) showing certain prior bad acts he had committed. The district court granted Harry's motion in part, excluding evidence of a prior conviction for distribution of a controlled substance to a minor but allowing the government to present witnesses who would testify to Harry's prior drug distribution activities. Not surprisingly, the government moved to exclude the evidence of Thul's prior bad acts. The district court granted the government's motion in part, excluding a 2000 judgment for conspiracy to manufacture methamphetamine; a 2003 judgment for operating a motor vehicle while intoxicated; and two 2000 judgments and one 2003 judgment for possession of methamphetamine. However, it allowed Harry to present evidence of 2003 and 2005 citations for possessing drug paraphernalia and a 2006 judgment for possession of methamphetamine.

At trial, the government offered three witnesses to rebut Harry's claim that he had not possessed the drugs with intent to distribute them. Kyle Chyma and Edgar Hernandez testified to selling Harry distribution quantities of methamphetamine, and

---

[4]Harry did not challenge the magistrate judge's finding that the officers had probable cause to conduct a traffic stop based on Harry's speeding.

[5]Though the magistrate judge who initially reviewed Harry's motion found the sniff had extended the stop by about 2½ minutes, the district court found the sniff had not extended the stop as "the sniff and the routine processing of a traffic violation occurred simultaneously." *Harry*, 2017 WL 5458002, at *5.

Ashley Laufenberg testified to buying a user amount of methamphetamine from Harry.

A jury found Harry guilty of possession with intent to distribute methamphetamine, and the district court sentenced Harry to 280 months' imprisonment. On appeal, Harry renews his argument that the officers lacked reasonable suspicion to search the truck he was driving and that the officers impermissibly extended the stop with the dog sniff. He also renews his prior bad acts arguments, claiming the district court abused its discretion in admitting Chyma's, Hernandez's, and Laufenberg's testimony and in excluding several of Thul's prior convictions.

## II. *Discussion*
### A. *Fourth Amendment Claim*

Harry argues the district court erred in denying his motion to suppress the evidence collected incident to the search of the truck, claiming the dog sniff impermissibly extended the traffic stop in violation of *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015), and that the sniff was not supported by reasonable suspicion. "This Court reviews the facts supporting a district court's denial of a motion to suppress for clear error and reviews its legal conclusions de novo." *United States v. Cotton*, 782 F.3d 392, 395 (8th Cir. 2015).

The Supreme Court has held

> that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a ticket for the violation.

*Rodriguez*, 135 S. Ct. at 1612 (cleaned up). In sum, "absent the reasonable suspicion ordinarily demanded to justify detaining an individual," an officer may not prolong a traffic stop beyond the time reasonably required to complete that stop. *Id.* at 1615. "Lacking the same close connection to roadway safety as the ordinary inquiries [i.e., checking for outstanding warrants], a dog sniff is not fairly characterized as part of the officer's traffic mission." *Id.* However, "as long as a traffic stop is not extended in order for officers to conduct a dog sniff, the dog sniff is lawful." *United States v. Fuehrer*, 844 F.3d 767, 773 (8th Cir. 2016).

*Fuehrer* is instructive. There, as here, two officers collaborated to process a stop. *Id.* In *Fuehrer*,

> [Officer Two] arrived within two minutes of [Officer One] initiating the traffic stop. Because [the defendant] did not have a license, [Officer One] asked [the defendant] to sit in the patrol car while he completed paperwork. [Officer Two] conducted the dog sniff while [the defendant] was in the patrol car. [Officer One] completed the tasks related to the traffic stop and wrote [the defendant] a warning after the dog sniff was complete and the dog had alerted to the presence of narcotics.

*Id.* Because the traffic stop and the search had occurred simultaneously, we explained "there [was] no evidence that the dog sniff unlawfully prolonged the traffic stop" and concluded that *Rodriguez* was inapposite. *Id.*

*Fuehrer*'s logic applies to this case. The district court found that the dog sniff did not extend the stop, and we agree. As the record demonstrates, Investigator Williams and Deputy Kearney simultaneously processed the traffic violation and conducted the dog sniff.

We note that there were two purposes for the stop of Harry's vehicle: one was for his traffic violation and the other was for his suspected transportation of illegal

-6-

drugs. Even if the dog sniff had extended the traffic stop, the extension would have been permissible, as the CI's tip provided reasonable suspicion for Deputy Kearney to perform the drug search.

Harry argues the CI's tip could not provide reasonable suspicion for a search as the CI's reliability had not been established. However, "[a]n informant may . . . prove himself to be a reliable source for law enforcement by providing predictive information about a meeting time or place." *United States v. Winarske*, 715 F.3d 1063, 1067 (8th Cir. 2013). As the Supreme Court explained in *Alabama v. White*, "[b]ecause only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities." 496 U.S. 325, 332 (1990).

Here, the CI provided police with accurate predictive information. This information included: a description of the truck Harry would be driving, including information about its registration; who would be in the truck; and what time the truck would be arriving in Dubuque. The information was specific rather than generic and therefore unlikely available to someone without reliable insight into Harry's activities. Based on that information, Deputy Kearney had reasonable suspicion to search the truck regardless of the speeding violation.

We hold the district court properly denied Harry's motion to suppress.

## B. *Prior Bad Acts*

Evidence of prior bad acts is not admissible to show criminal propensity; however, such evidence may be admitted for other purposes, such as proving knowledge or intent. Fed. R. Evid. 404(b). By its very language, Rule 404(b) encompasses both prior convictions and other bad acts not resulting in conviction. "[T]he party seeking to admit [such] evidence must show it is '(1) relevant to a

-7-

material issue; (2) similar in kind and not overly remote in time to the crime charged; (3) supported by sufficient evidence; and (4) higher in probative value than prejudicial effect.'" *United States v. Turner*, 781 F.3d 374, 389 (8th Cir. 2015) (quoting *United States v. Trogdon*, 575 F.3d 762, 766 (8th Cir. 2009)).

### 1. *Harry's Prior Bad Acts*

Harry argues the district court erred in allowing Chyma, Hernandez, and Laufenberg to testify about his buying and selling methamphetamine. He characterizes their testimony as impermissible propensity evidence. However, because Harry put his mental state at issue at trial by arguing "mere presence," evidence of prior bad acts was admissible to prove his knowledge and intent. *See United States v. Thomas*, 58 F.3d 1318, 1322 (8th Cir. 1995).

> The lesson of [our] cases is clear. When a defendant raises the issue of mental state, whether by a "mere presence" defense that specifically challenges the mental element of the government's case or by means of a general denial that forces the government to prove every element of its case, prior bad acts evidence is admissible because mental state is a material issue.

*Id.*

Harry argues that the approach described in *Thomas* is suspect in light of our statement in *Turner* that "[s]imply asserting—without explanation—that the conviction is relevant to a material issue such as intent or knowledge is not enough to establish its admissibility under the Federal Rules." 781 F.3d at 390. However, *Turner* is inapposite where a defendant places his knowledge and intent at issue during trial. *See United States v. Valerio*, 731 F. App'x 551, 553 (8th Cir. 2018) (per curiam) (explaining that *Turner* was inapposite where the defendant "placed his knowledge or intent at issue" during trial). Furthermore, the district court here did not simply accept the government's assertion "without explanation," *Turner*, 781 F.3d at 390,

that Harry's prior bad acts were relevant to a material issue. Rather, the court engaged in the type of analysis required by *Turner*: thoughtfully reviewing all of the prior bad acts the government sought to present at trial, admitting some and rejecting others.

Because the evidence at issue served the legitimate non-propensity purpose of proving knowledge and intent, the district court did not abuse its discretion in allowing Chyma, Hernandez, and Laufenberg to testify.

Even if the district court had erred in allowing their testimony, however, such error would not constitute a basis for reversal. *See United States v. Eggleston*, 165 F.3d 624, 626 (8th Cir. 1999) (affirming conviction for possession with intent to distribute where the district court erroneously admitted propensity evidence but where such admission was harmless in light of the suspect's self-incriminating statements and other government evidence). Like the defendant in *Eggleston*, Harry made "damaging admissions out of his own mouth," *id.*, by claiming the drugs belonged to him and that Thul was just riding along. In addition, the government presented ample evidence of Harry's intent to distribute the methamphetamine, including the large quantity of drugs discovered in the truck he was driving; the text messages between him and Thul; and the CI's predictive tip. Considering the strength of the government's case, the district court's alleged evidentiary error would have been harmless.

## 2. *Thul's Prior Bad Acts*

Harry argues the district court erred in excluding evidence of Thul's 2000 conviction for conspiracy to manufacture methamphetamine and his 2000 and 2003 convictions for possession of methamphetamine.[6] The district court excluded these acts due to their remoteness, finding 14–17 years—the time between the commission

---

[6]Harry does not appear to contest the district court's decision to exclude Thul's conviction for operating a motor vehicle while intoxicated.

of the excluded acts and the trial date—too great a gap. Harry challenges this finding, arguing the bad acts were not remote, noting that Thul was incarcerated during a portion of the time between 2000 and 2017.

> We review a district court's ruling excluding evidence for an abuse of discretion. Absent an abuse of discretion, this Court will not substitute its judgment for the judgment of the district court. . . . "Reverse 404(b)" is a term some courts have used to refer to evidence of prior bad acts by a third party, introduced by the defendant and offered to implicate the third party in the charged crime.

*United States v. Battle*, 774 F.3d 504, 512 (8th Cir. 2014) (cleaned up). We apply the same factors whether analyzing "regular" 404(b) evidence or so-called "reverse" 404(b) evidence. *See, e.g.*, *id.* at 513.

> To determine if evidence is too remote, the [district] court applies a reasonableness standard and examines the facts and circumstances of each case. There is no fixed period within which the prior acts must have occurred. We have generally been reluctant to uphold the introduction of evidence relating to acts or crimes which occurred more than thirteen years prior to the conduct challenged.

*United States v. Halk*, 634 F.3d 482, 487 (8th Cir. 2011) (cleaned up). We noted in *Halk* that a court may consider incarceration as a factor weighing against remoteness. *Id.*

Harry's argument for not excluding the 2000 and 2003 bad acts makes sense. However, considering that we have identified 13 years as the typical outer limit for remoteness, *see Halk*, 634 F.3d at 487, we cannot say the district court abused its discretion in excluding 14–17 year old bad acts. We decline to "substitute [our] judgment for the judgment of the district court." *Battle*, 774 F.3d at 512 (internal quotation omitted).

### III. *Conclusion*

We affirm Harry's conviction.

_____